## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| JUSTIN HARMON, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| XCHANGE LEASING, LLC, a wholly owned subsidiary of UBER TECHNOLOGIES, INC., ABC, INC., XYZ CORP., and JOHN/JANE DOES A THROUGH D, | COMPLAINT |
| Defendants. | |

### COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** Plaintiff, JUSTIN HARMON ("Plaintiff"), by and through his undersigned counsel, and by way of this Complaint seeks relief against Defendant XCHANGE LEASING, LLC, a wholly owned subsidiary of UBER TECHNOLOGIES, INC. ("Defendant") for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq.* ("Title VII"), and the Florida Civil Rights Act of 1992, Florida Statutes §§760.01-760.11 (the "FCRA"). In support thereof, Plaintiff states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff is an adult male who is a citizen of and resides in Miami, Miami-Dade County, Florida. At all times relevant herein, Plaintiff has lived in Miami-Dade County, Florida.

2.      At all times material hereto, Defendant is and was a foreign corporation authorized, operating and licensed to do business in the State of Florida. Defendant is and has been a covered "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b) and the FCRA, at all times relevant to this Complaint. Defendant is a

"person" and "employer" within the meaning of 42 U.S.C. § 2000e(a).

3.      Plaintiff was an "employee" of Defendant and an "aggrieved person" within the meaning of 42 U.S.C. §2000e(f) and the FCRA § 760.02(10), from October 10, 2016, until his constructive termination on or about January 11, 2018.

4.      Defendants XYZ Corp. and ABC, Inc., are fictitious names; Plaintiff hereby reserve his right to amend the Complaint as a result of pleading fictious parties. XYZ Corp. and ABC, Inc., are entities that may have discriminated against Plaintiff, but they are as yet unknown.

5.      Defendants John and Jane Does A-D are fictitious names; Plaintiff hereby reserves his right to amend the Complaint as a result of pleading fictious parties. John and Jane Does A-D are individuals that may have discriminated against Plaintiff, but they are as yet unknown.

6.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, 28 U.S.C. §1367, 42 U.S.C. §2000e(5)(f)(3), and Florida Statutes §§760.11 and 761.03-761.04. All conditions precedent to jurisdiction have occurred:

    a.  Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") within 300 days of the commission of the unlawful employment practices of Defendant;

    b.  On or about August 26, 2020, the EEOC issued a  Notice of Right to Sue;

    c.  This complaint is being timely filed within 90 days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

7.      Most, if not all, of the acts of unlawful discrimination set forth  in this Complaint occurred  in the City of Miami, Miami-Dade County, Florida. Accordingly, venue

is proper in this judicial district pursuant to 28 U.S.C. §§1391 (b) and (c).

## FACTUAL BACKGROUND

8.      Plaintiff is an African American male.

9.      As the Lead Leasing Specialist, Plaintiff was responsible for launching the Hollywood, Florida Showroom, where Defendant would lease cars out to Uber's drivers in Miami-Dade and Broward Counties.

10.     George Mclean, a Caucasian male, was hired in or about December 2016 as Manager of the Hollywood Showroom and without reasonable basis unlawfully relieved Plaintiff of his duties. Plaintiff then moved on to launch the Tampa, Florida market.

11.     Plaintiff was subsequently promoted from Lead Leasing Specialist to Showroom Manager after the year end 2016 performance review, on or about January 19, 2017. He received a prorated bonus and his salary increased from $47,500 to $52,250. The salary increase was attributable to his Plaintiff's job level promotion. However, Plaintiff alleges that his pay may not be consistent with the pay and other benefits provided to his non-African American counterparts.   Accordingly, Plaintiff believed his  salary was well below market value and what was being paid to his non-African American colleagues.

12.      Plaintiff discussed his concerns with his direct manager, his general manager and with members of Defendant's  human resources group. Plaintiff's concerns were not taken seriously or made subject to a reasonable, objective, unbiased and thorough investigation, being told that his concerns are part of a company-wide situation and that his salary will not be adjusted and this is despite the fact that his non-African American counterparts in other Uber districts were earning salaries consistent with job performance while, at the same time Plaintiff was being unlawfully denied such opportunities.

13.     After Defendant  went through a company-wide compensation review based on

the Covington Recommendations, recommendations provided to Defendant by a special committee to improve Defendant's corrosive corporate culture, Plaintiff's salary was increased to $65,728 on or about August 1, 2017, without being compensated for unlawfully discriminatory pay prior to the company-wide compensation review. .

14.     On or about June 5, 2017, George Mclean's employment with Defendant was terminated, and Plaintiff was put in charge of running the Hollywood Showroom. Shortly after reviewing the operations at the Hollywood Showroom, Plaintiff noticed there were employees that were committing insurance fraud by forging customer signatures and doctoring lease documents so that they would be approved by Defendant's central operations team. Specifically, if the Central Operations team did not approve a contract for a common error, such as a spelling mistake or a forgotten signature, some of the leasing specialists would use a computer program called PDF Escape or would manually alter the documents so they would be approved, rather than simply having the customer return to correct the errors by way of document edits.

15.     On or about June 27, 2017, Plaintiff sent an email to his manager, Travis Lynk, and detailed his findings to him, along with exhibits of the altered insurance documents. The following day, Plaintiff traveled to Dallas, Texas to work from the Dallas Showroom, and when he arrived, the General Manager for the Southeast, Raj Naik, was on site. Plaintiff advised Mr. Naik of his findings, as well as his email to Mr. Lynk and was told to try to figure out how far the insurance fraud issue had spread and whether it was specific to the Miami Showroom or was region-wide problem. Mr. Naik should have immediately informed Uber's legal department and senior management of the potential problem. However, Mr. Naik was hesitant in doing so as he explained so as not to escalate and to create additional problems given that his direct supervisor informed Plaintiff that the Atlanta market had just failed a compliance

report, and that the additional information  would not have  been well received by Mr. Naik due to concerns  about insurance fraud across his region.

16.     Plaintiff and his assistant manager Xavian Romeu were directed to research former contract submissions from the Hollywood Showroom  to determine when the fraud had occurred and estimate how many lessees were impacted. Mr. Romeu and Plaintiff investigated the other major markets in the Southeast, including Atlanta, Miami and Dallas, and found there was the same type of potentially fraudulent activity occurring in all of the markets under review. During the weekly meetings with his manager, Plaintiff  expressed  concern that legal had not yet been informed  and that failure to do so  could negatively impact the company along with the  employment of those responsible for not exposing the problem. Mr. Lynk assured Plaintiff that he and Mr. Naik were having conversations with Defendant's legal department. These alleged conversations took place without Plaintiff (a key witness), as he was the manager who discovered and disclosed the problem and informed  management.

17.     On or about August 28, 2017, Kimberly Shakur from the internal fraud team came to the Hollywood Showroom to investigate a separate issue. While she was there, Plaintiff advised Ms. Shakur of the insurance fraud concerns and forwarded  all of the relevant documents  with respect to the matter.  Ms. Shakur assured Plaintiff that she would get the information to the appropriate  parties and that he would be updated accordingly. Ms. Shakur never carried out her responsibilities as required.

18.     On or about December 5, 2017, Plaintiff received a calendar notification of a "Human Resources Follow Up Call" with Victoria Reyes, Human Resources Business Partner for Defendant. In the same instant, Ms. Reyes sent a message regarding his attendance, to which Plaintiff requested asked why the conference is being scheduled so that he can be prepared to effectively respond to questions and to provide helpful input.

19.     At about 4:15 pm, Plaintiff called the conference line provided and discovered that it was not only Ms. Reyes on the call, but Roshida Dowe, a member of Defendant's legal team. Plaintiff was advised that the call was established as a  fact-finding effort  to I secure information needed to conduct an appropriate investigation, but Ms. Reyes and Ms. Dowe would not disclose  the basis for the investigation.  What occurred was  as a "follow up call" with Human Resources that turned into a three (3) hour deposition-style interrogation,  of Plaintiff by Defendant's lawyers without  having his own counsel participate . Plaintiff felt that his failure to cooperate would be used against him and, in addition, it would be in Defendant's best interests to fully cooperate with Defendant's investigation in the best interests of Defendant and Plaintiff. .

20.     The first half of the questioning involved the insurance investigation; specifically, when did Plaintiff report the problem, to whom he informed of the problem and why did he not escalate the issue past the General Manager. Plaintiff explained that he had escalated the insurance issue two levels above  his position, to his manager and then to his manager's manager. At that point, Plaintiff had taken every reasonable action to inform the appropriate people within Defendant's organization.  He felt that going beyond the reasonable reporting he had performed would jeopardize  his job by breaking the chain of command. Plaintiff was concerned that his employment would be terminated based on race and the disclosure of potentially unlawful misconduct engaged in by Defendant employees.   Plaintiff makes note that two (2) of the (3) African American male managers in his district had been terminated over the span of a few months, leaving Plaintiff has the sole African American male manager employed in the District. Plaintiff had felt that if he had broken the chain of command, that he would have  been terminated too and that, he had effectively  appropriately and effectively engaged his direct supervision with the reasonable expectation that they would

elevate the concern to the appropriate senior level individuals within Uber to take appropriate action which they failed to do other than to engaged in the unlawful race discrimination and retaliation.

21.     The second half of the questioning involved Plaintiff's relationship with one of Defendant's vendors. Defendant alleged that Plaintiff never disclosed his relationship to the company and created a conflict of interest, but this is not true. Plaintiff's relationship with the vendor, Wash My Whip, was disclosed to his direct manager, Travis Lynk; city manager southeast, Hamish Roberts; and city manager southeast, Ernest Benkovski. The vendor in question had previously been a vendor of Defendant's parent company, Uber, prior to Defendant opening operations in the Florida Market. Wash My Whip had been contracted to complete car washes at its Uber Greenlight Hub in Wynwood area in Miami, Florida. Plaintiff was not even the individual who interviewed and signed the contract with Wash My Whip; he simply referred the company as a prospective vendor to his manager and Defendant.

22.     At the conclusion of the call, Plaintiff was told not to discuss the details of the call with anyone and was being put on leave while they confirmed his facts. During this leave, Plaintiff lost all access to internal systems and was not allowed to attend company events or go to the office. Plaintiff expressed his dismay at the situation, as it seemed quite harsh since he was currently in the interview process for a few different promotional opportunities with Defendant. Ms. Reyes advised Plaintiff that the process should only take a couple days and reminded him again to only talk to herself or Ms. Dowe if he had any questions. At this time, Plaintiff felt as if he was being punished and retaliated against for being a responsible employee and disclosing violations of company policies and/or the law and that Uber responded by engaging in race-based harassment and retaliation that includes not only his termination of employment but the continued race based pay differentials complained of in his EEOC Charge.

23.     On or about December 11, 2017, Plaintiff called Ms. Reyes to let her know that Travis Lynk and Raj Naik had reached out to him via text message, inquiring as to whether or not Plaintiff had heard back from Human Resources. It was at this time that Plaintiff inquired as to the definition of whistleblower and whether or not it applied to his situation. Ms. Reyes advised him that he had done what he was supposed to do as a manager, but that she would have to get back to him regarding his whistleblower questions. The foregoing never occurred. The investigation was allegedly to be concluded by December 15, 2018, but this too was  false information insofar as it was never completed or, if completed, never discussed with Plaintiff.

24.     During Plaintiff's leave of absence, he did not have access to his work calendar and missed a scheduled call with the Uber General Manager of Florida, Kasra Moshkani. When Plaintiff reached out to him from his personal email to reschedule the call, Mr. Moshkani alerted Plaintiff to the fact that he had tried emailing his work account and the email bounced back, as if Plaintiff were no longer with the company. This was embarrassing to Plaintiff and greatly damaged his chances of securing a spot with the Miami Uber team. Ms. Reyes had assured Plaintiff previously that his email would not bounce back; he simply would not have access to his email messages.  This was a gross misrepresentation of what in fact had transpired which further compromised Plaintiff's continued employment with Defendant and ability to appropriately respond to information that may have been relevant to his situation.   When Plaintiff followed up with Ms. Reyes, she had no explanation for him, reasonable or otherwise.

25.     On or about December 21, 2017, Plaintiff received a call from Ms. Reyes and Ms. Dowe, explaining that after completing the investigation and working with the Uber Compliance team, Defendant had decided to reinstate Plaintiff back to active status. He was advised that the insurance investigation was ongoing and that he may receive additional calls in the future to clarify certain points. They  also explained that Plaintiff would have to attend

and complete conflict of interest training, as there were still concerns with regard to how he reported the conflict of interest to Uber. The details of their concerns were never provided. While Plaintiff had advised several managers within his region, he was apparently supposed to complete and submit a form to the Uber Compliance team for their review. Plaintiff would have known this if Defendant had provided the proper direction and training. For all new hires at Uber, there is a three (3) to four (4) day training called "Uberversity" held in San Francisco. Since Plaintiff worked for Defendant, Xchange Leasing, he did not technically work for Uber and was denied the opportunity to attend this training sessions, where he would have learned of the conflict of interest forms and other information critical to his role. Moreover, there remains the question of whether Plaintiff was an actual employee or contractor of Defendant.

26.    It is Plaintiff's firm position that he was targeted by human resources and Defendant's executive leadership due to his race and in retaliation for reporting and complaining about unlawful pay disparities and ethics violations.

27.    With no other choice, Plaintiff was  constructively discharged, due to the bad faith harassment, retaliation and raced-based unlawful discrimination in which Defendant engaged against Plaintiff.  Defendant made the working conditions so intolerable that Plaintiff had no choice but to constructively discharge  from Defendant.

<u>**COUNT ONE**</u>

**Race Discrimination in Violation of Title VII**

28.    Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 26 above as though set forth fully herein.

29.    By the conduct set forth in the Statement of Facts above, Defendant engaged in unlawful employment discrimination against Plaintiff on account of his race in violation of Title VII.

30.     Plaintiff is an African American male, therefore making him a member of a protected class.

31.     Plaintiff was paid lower wages than similarly situated employees outside of his protected class. Plaintiff was paid an annual salary of $52,250.00 as a Showroom Manager, while the following individuals in the same position had significantly higher salaries: Zach Hendrick, Caucasian male, salary of $84,500.00; Joey McLachlan, Caucasian male, salary of $84,500.00; Nick Ohlrogge, Caucasian male, salary of $84,500.00; and Brian Clary, Caucasian male, salary of $77,458.00.

32.     The conduct of Defendant in making the working conditions so intolerable that Plaintiff had no choice beyond constructive termination of employment was intentional. Defendant engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

33.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to his career and reputation, personal humiliation, mental anguish, and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages according to proof against Defendant.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Honorable Court:

A.  Enter judgment in Plaintiff's favor and against Defendant for its violations of Title VII;

B.  Award Plaintiff actual damages suffered;

C.  Front and back pay;

D.  Award Plaintiff compensatory damages under Title VII for the embarrassment,

anxiety, humiliation, and emotional distress Plaintiff has suffered and continues to suffer;

E.   Award Plaintiff prejudgment interest on his damages award;

F.   Punitive damages, according to proof;

G.   Enjoin Defendant, its officers, agents, employees and anyone acting in concert with them, from discriminating, harassing and retaliating against Plaintiff and any employee;

H.   Award Plaintiff reasonable costs and attorney's fees; and

I.   Grant Plaintiff such other and further relief as this court deems equitable and just.

J.   Plaintiff demands a trial by jury.

## COUNT TWO

### Violation of Title VII (42 U.S.C. §§2000e *et seq.*) - Retaliation

34.     Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraphs 1-32 above as though set forth fully herein.

35.     By the conduct set forth in the Statement of Facts above, Defendant engaged in unlawful retaliation against Plaintiff for questioning the higher salaries of his Caucasian counterparts and raising concerns of wrongful conduct, specifically insurance fraud, in violation of Title VII.

36.     After raising concerns about two (2) different matters, Plaintiff suddenly found himself the subject of an ethics investigation and was then forced to take a leave of absence. The investigation and subsequent forced leave were two (2) adverse employment actions Plaintiff endured after engaging in the above stated protected activities.

37.     The conduct of Defendant in making the working conditions so intolerable that Plaintiff had no choice beyond constructive termination of employment was intentional.

Defendant engaged in a retaliatory practice or practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

38.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to his career and reputation, personal humiliation, mental anguish, and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages according to proof against Defendant.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Honorable Court:

A.  Enter judgment in Plaintiff's favor and against Defendant for its violations of Title VII;

B.  Award Plaintiff actual damages suffered;

C.  Front and back pay;

D.  Award Plaintiff compensatory damages under Title VII for the embarrassment, anxiety, humiliation, and emotional distress Plaintiff has suffered and continues to suffer;

E.  Award Plaintiff prejudgment interest on his damages award;

F.  Punitive damages, according to proof;

G.  Enjoin Defendant, its officers, agents, employees and anyone acting in concert with them, from discriminating, harassing and retaliating against Plaintiff and any employee;

H.  Award Plaintiff reasonable costs and attorney's fees; and

I.  Grant Plaintiff such other and further relief as this court deems equitable and just.

J.  Plaintiff demands a trial by jury.

## COUNT THREE

### Violation of the FCRA – Race Discrimination and Harassment

39.     Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraphs 1 through 37 above as though set forth fully herein.

40.     By the conduct set forth in the Statement of Facts above, Defendant engaged in unlawful employment discrimination against Plaintiff on account of his race in violation of the FCRA.

41.     Plaintiff is an African American male, therefore making him a member of a protected class.

42.     Plaintiff was paid lower wages than similarly situated employees outside of his protected class. Plaintiff was paid an annual salary of $52,250.00 as a Showroom Manager, while the following individuals in the same position had significantly higher salaries: Zach Hendrick, Caucasian male, salary of $84,500.00; Joey McLachlan, Caucasian male, salary of $84,500.00; Nick Ohlrogge, Caucasian male, salary of $84,500.00; and Brian Clary, Caucasian male, salary of $77,458.00.

43.     The conduct of Defendant in making the working conditions so intolerable that Plaintiff had no choice beyond constructive termination of employment was intentional. Defendant engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

44.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to his career and reputation, personal humiliation, mental anguish, and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages according to proof against Defendant.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests this Honorable Court:

A. Declare that the acts complained of herein are in violation of the FCRA;

B. Award Plaintiff compensatory damages for emotional distress, embarrassment and humiliation;

C. Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which discriminations on the basis of race;

D. Order Defendant to make Plaintiff whole by compensating him for lost wages, benefits, including front pay and back pay with prejudgment interest;

E. For a monetary judgment representing prejudgment interest;

F. Award any other compensation allowed by law, including punitive damages and attorney's fees (Fla. Stat. §448.104);

G. Grant Plaintiff costs of this action, including reasonable attorney's fees;

H. Grant such other and further relief as the Court deems just and proper.

I. Plaintiff demands a trial by jury.

## COUNT FOUR

### Violation of the FCRA - Retaliation

45. Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraphs 1 through 43 above as though set forth fully herein.

46. By the conduct set forth in the Statement of Facts above, Defendant engaged in unlawful retaliation against Plaintiff for questioning the higher salaries of his Caucasian counterparts and raising concerns of wrongful conduct, specifically insurance fraud, in violation of the FCRA.

47.     After raising concerns about two (2) different matters, Plaintiff suddenly found himself the subject of an ethics investigation and was then forced to take a leave of absence. The investigation and subsequent forced leave were two (2) adverse employment actions Plaintiff endured after engaging in the above stated protected activities.

48.     The conduct of Defendant in making the working conditions so intolerable that Plaintiff had no choice beyond constructive termination of employment was intentional. Defendant engaged in a retaliatory practice or practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

49.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer lost wages, benefits and entitlements, damage to his career and reputation, personal humiliation, mental anguish, and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory damages, and punitive damages according to proof against Defendant.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff requests that this Honorable Court:

A.  Enter judgment in Plaintiff's favor and against Defendant for its violations of the FCRA;

B.  Award Plaintiff compensatory damages for emotional distress, embarrassment and humiliation;

C.  Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from discriminating, harassing and retaliating against Plaintiff and any employee;

D.  Order Defendant to make Plaintiff whole by compensating him for lost wages, benefits, including front pay and back pay with prejudgment interest;

FUERST ITTLEMAN DAVID & JOSEPH
ONE SOUTHEAST THIRD AVENUE, SUITE 1800, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FIDJLAW.COM

E. For a monetary judgment representing prejudgment interest;

F. Award any other compensation allowed by law including punitive damages and

attorney's fees (Fla. Stat. §448.104);

G. Grant Plaintiff costs of this action, including reasonable attorney's fees;

H. Grant such other and further relief as the Court deems just and proper.

I. Plaintiff demands a trial by jury.

## DEMAND FOR JURY DEMAND

Plaintiff hereby demands a jury trial on all claims in this Complaint.

Dated: November 24, 2020                Respectfully submitted,

By: */s/ Andrew S. Ittleman* _____
    ANDREW S. ITTLEMAN
    Florida Bar No. 802441
    **FUERST ITTLEMAN DAVID & JOSEPH**
    ***Local Counsel for Plaintiff***
    One Southeast Third Avenue, Suite 1800
    Miami, Florida 33131
    Telephone:(305) 350-5690
    Facsimile: (305) 371-8989
    Email: aittleman@fidjlaw.com
    Secondary: narcia@fidjlaw.com
    Secondary: lcabrera@fidjlaw.com

By: _/s/ John T. Herbert _____
    JOHN T. HERBERT
    New Jersey Bar No.: 002291975
    *(motion pro hac vice pending)*
    **HERBERT LAW GROUP, LLC**
    **Co-Counsel for Plaintiff**
    96 Engle Street, Suite 1
    Englewood, New Jersey 07628
    Telephone: (201) 490-4070
    Facsimile: (201) 490-4077
    E-mail: jherbert@herbertlawllc.com
    Secondary: kgooler@herbertlawllc.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Andrew S. Ittleman*
     ANDREW S. ITTLEMAN

SERVICE LIST
U.S. District Court
Southern District of Florida (Miami)
CIVIL DOCKET FOR CASE #: _____

Andrew S. Ittleman, Esq.
**FUERST ITTLEMAN DAVID & JOSEPH**
One Southeast Third Avenue, Suite 1800
Miami, FL  33131
Tele: 305-350-5690
Fax: 305-371-8989
Email: aittleman@fidjlaw.com
Secondary: narcia@fidjlaw.com
Secondary: lcabrera@fidjlaw.com
*Local Counsel for Plaintiff*
*JUSTIN HARMON*


John T. Herbert, Esq.
(*motion pro hac vic pending*)
**HERBERT LAW GROUP, LLC**
96 Engle Street, Suite 1
Englewood, New Jersey 07628
Telephone: (201) 490-4070
Facsimile: (201) 490-4077
E-mail: jherbert@herbertlawllc.com
Secondary: kgooler@herbertlawllc.com
*Co-Counsel for Plaintiff*
*JUSTIN HARMON*